Filed 9/11/25  P. v. Benson CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TYQUAN MARKEITH BENSON,<br><br>    Defendant and Appellant. | B335967<br><br>(Los Angeles County<br>Super. Ct. No. NA116416) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James D. Otto, Judge.  Affirmed.

Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Deepti Vaadyala, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Tyquan Markeith Benson appeals from the judgment of conviction entered after a jury trial. The jury found Benson guilty of the first degree murder of Alejandra Martinez, the attempted premeditated murder of Nadia Moralez, and other shooting-related offenses with respect to a shooting at a Long Beach taco truck on December 4, 2020.

On appeal, Benson contends the trial court abused its discretion in admitting statements made by his codefendant, Jacquise Wright, to a jailhouse informant during a *Perkins* operation[1] because Wright's statements were inadmissible hearsay. Benson relatedly argues the trial court abused its discretion in denying Benson's motion for a mistrial based on admission of the statements. Benson also contends a portion of the testimony of the prosecution's forensic firearm examiner during questioning about her qualifications—that a second examiner reviews her work for accuracy—violated Benson's Sixth Amendment confrontation clause rights. Finally, Benson argues the court erred in imposing fines and fees absent a showing by the prosecution that Benson had the ability to pay. We affirm.

---

[1] A police operation in which the police obtain statements made by a defendant to an undercover law enforcement agent or paid informant, typically in a jail cell, is referred to as a "*Perkins* operation." (See *Illinois v. Perkins* (1990) 496 U.S. 292.)

# FACTUAL AND PROCEDURAL BACKGROUND

A. *The Prosecution Case*[2]

    1. *The December 4, 2020 shooting*

At around 10:30 p.m. on December 4, 2020, Victor Valdez drove to a popular taco truck located at the intersection of Anaheim Street and Magnolia Avenue in Long Beach. He remained in his car because he was wary of a group of Hispanic men at the truck who appeared to be gang members. After about 15 minutes, two Black men arrived in a dark-colored sedan and parked next to Valdez. Valdez saw the men go to pick up food from the taco truck, but on their return to the sedan, both men got into an argument with the Hispanic group. Valdez then saw the man who had carried the food back from the taco truck get into the driver's seat of the dark sedan, and the sedan drove away. The sedan slowed near the taco truck, and Valdez heard gunshots and saw flashes of gunfire coming from the driver's side of the sedan directed toward the taco truck. The sedan then sped off. Valdez heard five to seven gunshots in total. He could not see the men's faces because they were wearing face masks of the type worn during the COVID-19 pandemic.

At around 11:00 p.m. on the night of the shooting, Stephanie Minuez was working as a cashier at the taco truck. There were around 10 to 12 people waiting in line to order, all of whom were Hispanic except for two Black males. The two Black males approached the taco truck to order food, and Minuez told

---

[2] Benson and Wright were tried together before a single jury. On the last day of the prosecution case, the court granted Wright's motion for a mistrial based on the sudden unavailability of his defense attorney. Wright is not a party to this appeal.

the men to return in about 15 minutes to pick up the order. The two men returned about 15 or 20 minutes later in two separate cars. One of the men returned in a dark sedan; the other returned in a white sedan. The two men exited their cars and came to the truck to pick up their food. Both men were tall, thin, appeared to be in their mid-20's, had short curly hair and tattoos, and wore chains. At trial Minuez identified the man who arrived in the dark sedan as Wright.

Minuez saw Wright and the other man interacting with the group of Hispanic people waiting in line. Although she did not hear the entire interaction, Minuez believed Wright challenged the Hispanic group, saying "Where are you from?" Minuez saw Wright return to the dark sedan; she thought the second man got into the white sedan. Wright, who was sitting in the driver's seat, pulled out a small gun and fired "several" shots in the direction of the Hispanic group. The crowd at the taco truck ran, and Minuez and her coworkers ducked behind the counter. While she was crouching down, Minuez heard a car make a turn, and then she heard more gunshots from the direction of Magnolia Avenue. When she stood up, both cars were gone.

Nadia Moralez and a girlfriend walked to the taco truck on the night of December 4. Moralez was a member of the East Side Longos criminal street gang. When she arrived at the truck, Moralez saw several "homies" from the East Side Longos. She also saw two Black men, both with short dreadlocks, ordering food from the truck. She identified Benson in the courtroom as one of the two men. Moralez realized she had dropped some cash on the ground, and when she moved away from the truck to pick up the money, the two men were "mad-dogging" her. When she returned, Benson started "banging" on her, asking her, "Where all

4

you [N words] from?" While Moralez was getting her food, she heard Benson shout, "Fuck Chongos," and then she fell to the ground and realized she had been shot in her arms, hip, and buttocks. She saw that an older woman behind her in line was bleeding profusely from her throat. Moralez observed two shooters in different locations: one shooter was initially on foot and then entered a gray sedan; the other fired gunshots from a vehicle on Magnolia Avenue. Moralez did not remember whether Benson discharged a gun.

Widhny Soto and her cousin, Martinez, were waiting in line to pick up their food order when Soto heard about four gunshots coming from the front of the taco truck. Soto ducked down and tried to hide in the bushes. Soto looked up at Martinez, who was standing and clutching her upper chest. Soto pulled Martinez down to the ground and tried to cover her body while Soto heard several gunshots from a different location. Martinez was taken in an ambulance to the hospital, and she died two hours later.

2. *The police investigation*

City of Long Beach (Long Beach) police officers and forensic specialists secured and processed the crime scene within hours after the shooting. Investigators recovered four 9-millimeter cartridge cases, a bullet, and a copper jacket bullet in the parking lot in front of the taco truck. Another bullet was recovered from under the truck, two .380 automatic cartridge cases were found on the back bumper of the truck, and a third .380 automatic cartridge case was found in a planter box behind the truck. Two bullet fragments were also found on the other side of the planter box.

Homicide detectives obtained surveillance video footage from a gas station directly across Anaheim Street from the taco truck and from a liquor store located two blocks east on Anaheim Street. Excerpts were played for the jury. Video footage from the gas station showed that on the night of the shooting a dark gray sedan parked in the taco truck parking lot and two men emerged—one was wearing a white hooded sweatshirt with dark pants, and the other was wearing a dark shirt with light-colored jeans. The men walked to the taco truck, then returned to their car and drove east on Anaheim Street.

The liquor store surveillance video showed a gray sedan pulling into the store's parking lot shortly after 11:00 p.m. Two men emerged. One of the investigating detectives identified Benson (whose face was visible) as the individual wearing a darker shirt and light jeans. The second man wore a white hooded sweatshirt with a visible brand logo and gray sweatpants. The men entered the liquor store then returned to their car and drove off at around 11:07 p.m.

Later video footage from the gas station showed the two men returning to the taco truck in separate vehicles.[3] First, a light-colored vehicle pulled into the taco truck parking lot, and the man in the dark shirt and lighter pants (matching Benson's appearance at the liquor store) emerged. Then, the darker sedan pulled into the parking lot with its hazard lights flashing, and the man in the white hooded sweatshirt got out. After a short

---

[3] The time index on the gas station video indicated the two men returned to the taco truck at 23:15. However, there was no evidence at trial that the time index on the video corresponded with the time of day, and the percipient witnesses testified the shooting occurred later.

time, both men returned to their respective vehicles with Benson carrying a food bag. The dark sedan made a three-point turn and drove out of the parking lot onto Magnolia Avenue. The lighter vehicle, which had visible damage on the driver's side door, began driving northwest through the parking lot.

At this point the gas station surveillance video malfunctioned, and the initial shooting was not recorded. When the video resumed, however, people could be seen running away from the taco truck, and several people dropped to the ground or hid by the truck's wheel well. The darker vehicle could be seen driving south down Magnolia Avenue in the direction of Anaheim Street, and flashes emanated from the driver's side window. After investigators viewed this footage, a detective returned to the location where the vehicle was observed and recovered a single .45-caliber cartridge.

Long Beach police created a vehicle profile from the surveillance videos, which showed distinctive damage on the driver's side door of the lighter vehicle. In January 2021 a gold sedan with damage on the driver's side door matching the vehicle in the surveillance videos was found abandoned after a traffic accident in Long Beach. Benson was the registered owner of the vehicle, a benefits card with his name was found on the floorboard, and Benson had posted photographs of the vehicle on social media. Police searched the vehicle and recovered three live 9-millimeter cartridges in a compartment in the driver's side door.

Long Beach detectives obtained a warrant to search Benson's social media accounts. Images from these accounts admitted at trial included a photograph of Benson and Wright together and several photographs of firearms. On December 9,

2020 Benson posted on multiple social media accounts, "Blower[4] for sale," and he included a photograph of a 9-millimeter semiautomatic pistol. Benson's social media posts also indicated that he frequently spent time in Las Vegas. Long Beach detectives learned that Las Vegas police had recovered a firearm in an unrelated shooting incident that was a potential match (based on a national ballistics database) for one of the weapons used in the December 4 shooting. Long Beach investigators examined the Las Vegas firearm, a 9-millimeter semiautomatic pistol, and determined it matched the ballistic evidence recovered from the taco truck. The pistol also appeared identical to the one pictured in Benson's social media advertisement to sell a "blower," and his other social media posts included photographs of the recovered pistol's serial number. Benson was arrested on February 18, 2021.

Long Beach detectives also searched Wright's social media accounts and found photographs of him wearing a white hooded sweatshirt with a logo matching the one seen in the liquor store surveillance video. Homicide detectives executed a search warrant at Wright's residence on the morning of February 18, 2021, and they recovered a loaded .45-caliber semiautomatic handgun and multiple .45-caliber cartridges, as well as Wright's wallet, driver's license and credit card. Wright was arrested the same morning; at the time of his arrest, he was wearing gray sweatpants with printing consistent with the sweatpants in the surveillance videos. Police also impounded a gray sedan at the time of his arrest.

---

4       The prosecution gang expert testified the terms "blower" and "burner" refer to a firearm.

Long Beach Police Detective Benjamin Hearst testified at trial as the prosecution's gang expert.[5] Detective Hearst explained that the Insane Crips are a Black criminal street gang that claimed territory near the location of the shooting. The Insane Crips were rivals to all the Hispanic gangs in Long Beach, including the East Side Longos, who claimed the territory where the taco truck was located. The Insane Crips used "donkey" and "Chongo" as derogatory terms for Hispanic gang members.

At trial, Detective Hearst pointed out multiple tattoos on Benson's and Wright's bodies that could be seen on photographs displayed to the jury. Detective Hearst opined based on the tattoos that Benson and Wright were members of the Insane Crips. Detective Hearst also testified about a note Benson showed to a female who visited him while he was in pretrial detention. The note stated, "I need you to book a visit with my crimy[6] so you can tell him to go self-defense. They got bro [on] video. The donkeys not coming 3 court. So say he shot because they was shooting at us." Detective Hearst interpreted the message to mean that the Hispanic gang members would not testify in the trial. Detective Hearst also explained that Benson's use of the numeral "3" instead of "2" indicated his loyalty to the Insane Crips because the numeral "2" was associated with the Rolling 20s Crips, a rival gang.

Leanna Kim, a criminalist in the Long Beach Forensic Science Services Division, served as the crime lab firearms examiner in the investigation. Kim was responsible for

---

[5]     No gang crimes or enhancements were charged in the case.

[6]     Detective Hearst testified that a "crimy" refers to a fellow gang member who participated in a crime.

identifying projectile and cartridge evidence found at the crime scene to determine whether one or more specific firearms had been used. Kim explained how she used a comparison microscope to examine distinctive characteristics that are "imparted on" a firearm during the manufacturing process, leaving unique markers on a cartridge or bullet. Kim examined the three .380 automatic cartridge cases recovered near the taco truck and concluded they were all fired from the same firearm. She also examined the .45-caliber cartridge case recovered from the street and three of the projectiles, and she concluded they were all fired from the handgun recovered from Wright's residence. Finally, she examined the four 9-millimeter cartridge cases recovered from the taco truck parking lot with several cartridges that had been test-fired from the pistol seized in Las Vegas, and she concluded the recovered cartridge cases had been discharged from the same 9-millimeter pistol.

      3.     *Wright's statements to the Perkins agent*

Benson and Wright were placed in separate jail cells after their arrests on February 18, 2021, and detectives placed *Perkins* agents in each of their cells.

After the *Perkins* agent was in place, detectives came into Wright's jail cell to take a DNA sample, and they presented him with some of the inculpatory evidence—including images from the liquor store surveillance camera—in an effort to stimulate a conversation between Wright and the *Perkins* agent. Wright subsequently conversed with the agent for nearly two hours, and excerpts of the audio recording of their conversation were played for the jury.

In one excerpt, Wright expressed anger that police entered his residence when he was not home and found the .45-caliber handgun. The *Perkins* agent asked, "But it was your burner?" Wright responded, "Uh-huh."

In another excerpt, the *Perkins* agent stated the detectives appeared to be focusing their investigation on surveillance videos and there were multiple gas stations near the taco truck. He told Wright, "So it's cameras all around that motherfucker. What you got to think about, . . . you sure you didn't go . . . to the fucken taco truck that night?" Wright responded, "I did to get food, and I left. That's how they caught me on camera at the liquor store."

The *Perkins* agent suggested it was the "donkeys" and "Chongos" who committed the shooting. Wright agreed and said, "[W]e was at the taco truck, but we really ordered food. . . . Then the Mexicans showed up." Wright explained that "[w]e went to the store," then "we came back and got our food, then came back again," and "we were in two different cars. So I left out the parking [lot]. They were shooting at [inaudible]. So I turned off and got on." The detective who supervised the *Perkins* operation testified that in his experience the term "get on" meant to fire a gun.

The *Perkins* agent then pivoted to Wright's companion, telling Wright, "[T]hey know you was with whoever did the busting. Trust me. Y'all probably was in separate cars, but they did [their] homework. They followed these . . . cameras . . . . If you wasn't doing the busting—don't go down for the next nigga's shit. . . . Because to me it sound like y'all went up there to . . . get y'all tacos and shit. Donkeys come trippin', and your boy get off." Wright responded, "[T]hat's what the officer [told] me. He [said], 'It don't look like you went to go get in no trouble. It just

something happened.'" The *Perkins* agent pressed the issue further, stating, "[T]hey know it was either you or your boy who got off. Who got off?" Wright responded, "Y'all know it wasn't me."

The *Perkins* agent asked Wright, "What the fuck was this nigga shooting with?" Wright responded, "He had a Ghost 9 with a muffler on" and added that a Ghost 9 was "a gun that was untraceable." When the agent asked if the shooter got rid of the gun, Wright responded, "I'm positive" and emphasized that the police would not be able to find it.

Prompted by the *Perkins* agent's repeated suggestion that the Hispanic gang started the shooting, Wright gave a detailed narrative of the events that night. He explained that "we" went to get food, and he (Wright) tried interacting with two "Mexican cats," but they were rude to him. He added that "[m]y boy" paid for the food, and the taco truck employee told them to return later. They sat in the car smoking, but when "a gang of Chongos [was] walking through the parking lot," Wright said, "'Bro, I'm not about to sit right here just getting food, bro. We gotta go to the store or something.'" Then "we" left for the liquor store to buy something to drink and went to "the house." Wright said he wanted to "get in a different car, because I don't want us to pull back up, and they get to busting on one car. Make it seem like I'm just another car trying to get something to eat." Wright got a different car, and they returned to the taco truck in separate cars. They then got their food, but by then "the Mexicans is walking right through the parking lot. So I walk to my car. They, like, 'What that Longo—like—like, what that Longo [inaudible].' So I'm like, 'Bro, get the fuck out of here with that shit.' I never banged on him. I never said anything. I'm just

standing at the back of my car looking out.  Then when they walk past my car, I get in the car, and I turn out.  I pull up behind the taco truck, and I look.  And then I hear shots.  When I heard the shots, I turn right on Anaheim [Street].  And I got the fuck up out of there."

The *Perkins* agent asked if the shooter fired from Wright's car or from the shooter's own car, and Wright responded, "his own car."  The agent suggested the police would nonetheless try to blame Wright for the shooting because Wright's car drove off during the shooting.  Wright responded, "Yeah, that doesn't place me in no homicide though. That just place[s] me where something happened."[7]

B.    *The Defense Case*

Benson presented three witnesses in his defense.  His wife, Yesenia Benson (Yesenia), provided Benson with an alibi for the

---

[7]    During the *Perkins* operation with Benson, the agent asked Benson, "Was it one motherfucker busting or was it two motherfuckers busting?" and Benson responded, "Two."  The agent asked, "Did the—did the nigga get out of the car and bust or a nigga stayed in the car?"  Benson responded, "I was in the car."

   The *Perkins* agent primarily focused on the gun used in the shooting, and Benson said it was "gone" and "I got rid of it."  The agent asked if the gun was "dirty," and Benson responded, "I bought that motherfucker in Barstow."  Benson also said his confederate got rid of his gun.  Benson told the agent, "The only shit they really got on me is just my car.  That's it. . .  And it's gold, and my shit is gold."  Benson volunteered that he later went back to the location "where this shit happened," "I didn't see no camera," and the police were lying about having video surveillance.

13

time of the shooting, stating she had messaged him to pick up food from the taco truck around 11:00 p.m., but he was with her around the time of the shooting. A defense gang expert testified that a gang member's challenge to a rival gang member asking "Where are you from?" would be intended to provoke the person believed to be a gang member to react. The expert also explained the term "crimy," which Benson used in his jailhouse note, did not necessarily refer to an accomplice in a criminal act, but rather, could simply refer to a gang associate. Finally, a forensic gunshot residue expert testified based on his examination of nitrate patterns on Moralez's clothing that she must have been shot from a distance of only four to six feet.

The prosecution rebuttal case focused on impeachment of Yesenia. For example, a homicide detective testified there was no record that Yesenia messaged Benson on December 4, 2020.

C.    *The Verdict and Sentencing*

The jury found Benson guilty of the first degree murder of Martinez (Pen. Code, § 187, subd. (a); count 1);[8] the attempted willful, deliberate, and premeditated murder of Moralez (§§ 187, subd. (a), 664; count 2); assault with a semiautomatic firearm (§ 245, subd. (b); count 3); discharging a firearm from a vehicle (§ 26100, subd. (c); count 4); and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 5). The jury also found true with respect to counts 1 through 4 that Benson personally used a firearm in the commission of the offenses (§ 12022.5, subd. (a)). Benson waived his right to a jury trial with respect to a prior conviction for first-degree burglary (§ 459) and admitted he had

---

[8]    Further undesignated statutory references are to the Penal Code.

14

suffered a prior strike conviction under the three strikes law
(§§ 667, subds. (b)-(j), 1170.12), which was a serious felony under
section 667, subdivision (a).  Benson also waived a jury trial on
the alleged aggravating factors, and the trial court found true as
to all counts multiple allegations of circumstances in aggravation
under California Rules of Court, rule 4.421(a) and (b).

The trial court sentenced Benson to an aggregate state
prison term of life plus 50 years to life, plus 17 years
eight months.[9]  The sentence was comprised of 25 years to life on
count 1 for murder, doubled under the three strikes law, plus the
upper term of 10 years for the firearm-use enhancement and a
five-year term for the prior serious felony under section 667,
subdivision (a); a life sentence on count 2 for attempted murder
plus 16 months (one third the middle term of four years) for the
firearm use enhancement, to run consecutive to count 1; and a
consecutive term of 16 months (one third the middle term of
two years, doubled under the three strikes law) on count 5 for
possession of a firearm by a felon.  The court imposed and stayed
under section 654 a sentence of six years on count 3 for assault
and five years on count 4 for discharging a firearm from a vehicle.

The trial court ordered Benson to pay $12,300 in victim
restitution, plus interest.  The court also imposed a
$300 restitution fine (§ 1202.4, subd. (b)), a $200 court operations

_____

[9]     In the oral pronouncement of the sentence, the trial court
stated Benson's aggregate determinate sentence was 17 years
four months.  However, the individual components of the
determinate sentence pronounced by the court at the sentencing
hearing add up to 17 years eight months.  Further, the minute
order and abstract of judgment correctly reflect imposition of a
determinate sentence of 17 years eight months.

assessment (§ 1465.8, subd. (a)(1)), and a $150 criminal conviction assessment (Gov. Code, § 70373).  The court imposed and stayed a $300 parole revocation restitution fine (Pen. Code, § 1202.45).

Benson timely appealed.

## DISCUSSION

A.    *The Trial Court Did Not Abuse Its Discretion in Admitting Wright's Statements to the Perkins Agent*

1.    *Trial court proceedings*

In his trial brief, the prosecutor designated portions of the audio recording of Wright's statements to the *Perkins* agent that he intended to introduce at trial.  The prosecutor argued the statements were admissible as declarations against penal interest, and because they were nontestimonial, their admission against Benson did not violate Benson's confrontation clause rights under the *Aranda-Bruton* doctrine.[10]

---

[10]    "The *Aranda-Bruton* doctrine 'addresses a specific issue that arises at joint trials when the prosecution seeks to admit the out-of-court statement of a nontestifying defendant that incriminates a codefendant,' and prevents such a statement's admission even if a limiting instruction is given to the jury." (*People v. Tran* (2022) 13 Cal.5th 1169, 1194, citing *Bruton v. United States* (1968) 391 U.S. 123 and *People v. Aranda* (1965) 63 Cal.2d 518.)  In *Tran*, at page 1195, the Supreme Court explained that confrontation clause rights under the *Aranda-Bruton* had been "narrowed . . . to testimonial statements only." (Accord, *People v. Cortez* (2016) 63 Cal.4th 101, 129 ["'the confrontation clause applies *only to testimonial hearsay*

16

At a pretrial hearing, Benson joined Wright's oral *Aranda-Bruton* motion to exclude both defendants' statements in the *Perkins* operations and their other jailhouse statements. Benson's attorney argued Wright's statements to the *Perkins* agent incriminated Benson in violation of his confrontation rights. Neither Wright's attorney nor Benson's attorney specifically addressed whether the statements to the *Perkins* agent fell within the exception to the hearsay rule for declarations against interest. However, relying on *People v. Greenberger* (1997) 58 Cal.App.4th 298, 335, the trial court found the statements were nontestimonial, and further, "no statements . . . are so inculpatory to one defendant and exculpatory as to the person speaking that would justify" exclusion.[11]

---

*statements* and not to [hearsay] statements that are nontestimonial'"].)

Where, as here, a defendant speaks to an agent posing as an inmate and the defendant does not know the agent is a government informant, the statements are nontestimonial because the defendant would not expect the statements could be used in a future prosecution. (See *People v. Almeda* (2018) 19 Cal.App.5th 346, 362-363; *People v. Gallardo* (2017) 18 Cal.App.5th 51, 67-68.) On appeal Benson does not contend admission of Wright's statements violated his rights under the confrontation clause.

[11]     In *People v. Greenberger, supra*, 58 Cal.App.4th at pages 314, 337, 340 to 341, the Court of Appeal concluded the trial court did not abuse its discretion in finding multiple secretly recorded statements by individual defendants against their accomplices were admissible as declarations against penal interest because the declarants implicated themselves and their codefendants and there was sufficient indicia of reliability.

17

2.   *The hearsay exception for declarations against penal interest*

"Although hearsay statements are generally inadmissible as evidence (Evid. Code, § 1200, subd. (b)), California law recognizes several exceptions to this rule." (*People v. Jasso* (2025) 17 Cal.5th 646, 668 (*Jasso*).)  Evidence Code section 1230 provides a hearsay exception for statements against interest: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability . . . , that a reasonable man in his position would not have made the statement unless he believed it to be true."  (See *Jasso*, at p. 698; accord, *People v. Grimes* (2016) 1 Cal.5th 698, 710-711 (*Grimes*).)

"'To demonstrate that an out-of-court declaration is admissible as a declaration against interest, "[t]he proponent of such evidence must show that the declarant is unavailable,[12]

---

The People argue Benson forfeited his contention that Wright's statements to the *Perkins* agent were inadmissible hearsay because his attorney did not object.  We decline to find forfeiture because the hearsay and confrontation clause issues were intertwined, and further, the trial court decided the statements were not hearsay in finding they were not "so inculpatory to one defendant and exculpatory as to" the declarant to fall outside the hearsay exception.

[12]   Evidence Code section 240, subdivision (a)(1), defines "unavailable as a witness" to mean the declarant is "[e]xempted or precluded on the ground of privilege from testifying concerning

18

that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." [Citation.] "In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.""" (*Jasso, supra*, 17 Cal.5th at p. 668, quoting *Grimes, supra*, 1 Cal.5th at p. 711.)

The hearsay exception for declarations against interest does not apply ""to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant."" (*Jasso, supra*, 17 Cal.5th at p. 669; accord, *People v. Leach* (1975) 15 Cal.3d 419, 441.) Even so, "the nature and purpose of the against-interest exception does not require courts to sever and excise any and all portions of an otherwise inculpatory statement that do not 'further incriminate' the declarant. Ultimately, courts must consider each statement in context in order to answer the ultimate question under Evidence Code section 1230: Whether the statement, even if not independently inculpatory of the declarant, is nevertheless against the declarant's interest, such that 'a reasonable man in [the declarant's] position would not have made the statement

---

the matter to which his or her statement is relevant." "One such privilege, the exercise of which makes a person unavailable as a witness, is the constitutional privilege against self-incrimination." (*People v. Cudjo* (1993) 6 Cal.4th 585, 616.) It is undisputed that Wright was "unavailable as a witness" under Evidence Code section 1230.

unless he believed it to be true.'" (*Grimes, supra*, 1 Cal.5th at p. 716; accord, *People v. Smith* (2017) 12 Cal.App.5th 766, 789.)

We review a trial court's decision whether a statement is admissible under Evidence Code section 1230 for abuse of discretion. (*Jasso, supra*, 17 Cal.5th at p. 669; *Grimes, supra*, 1 Cal.5th at pp. 711-712.)

>    3.    *The trial court did not abuse its discretion in admitting Wright's statements as declarations against interest*

Benson contends the trial court abused its discretion in admitting Wright's statements to the *Perkins* agent because "Wright was careful not to provide facts that suggested he participated in the shooting." Rather, Wright described an innocent outing to the taco truck marred by the aggression of the Hispanic gang, and he implicated his companion as the shooter. Further, Benson argues the court erred in admitting all of the statements designated by the prosecution without considering each statement that implicated Benson separately. The court did not abuse its discretion.

Wright's statements to the *Perkins* agent were individually and holistically self-incriminating, particularly in the context of the *Perkins* agent's prompts. Confronted with the suggestion there could be video surveillance of the taco truck, Wright volunteered that he and a companion ("we") went to the taco truck on the night of the shooting. He admitted he had an unpleasant interaction with the "Mexican cats" in the taco truck line, and a "gang of Chongos" were in the parking lot. He and his companion left the area because of the gang, went to the liquor store and then Wright's home, and returned in separate vehicles

20

at Wright's suggestion so the gang would not recognize them. Wright admitted he was present at the shooting, and he drove off immediately after the shooting.

When the *Perkins* agent posited the Hispanic gang started things, Wright stated, "They were shooting at [inaudible]. So I turned off and got on" (meaning Wright fired a gun). Wright also admitted he owned the .45-caliber handgun found in his residence. Only after the *Perkins* agent suggested the police knew "it was either you or your boy who got off" did Wright respond, "Y'all know it wasn't me." But despite his minimization of his role, Wright implicated himself as an accomplice in explaining the shooter used an untraceable 9-millimeter "ghost" gun that the shooter got rid of and never would be found.

Nothing in Wright's statements is substantially exculpatory from criminal liability. Wright implicated himself as either an actual shooter or an accomplice in the shooting. He stated the shooting was gang-motivated. He described a series of events that suggest planning and premeditation on his part, including his decision to return to the taco truck in separate cars. Even his conclusory denials—for example, when he told the *Perkins* agent the fact he drove off from the shooting "doesn't place me in no homicide"—suggests his rehearsal of a defense rather than a denial of involvement. In the context of Wright's conversation with the person Wright believed was a fellow inmate, Wright's statements were reliable, and "'a reasonable man in [Wright's] position would not have made the[se] statement[s] unless he believed [them] to be true.'" (*Grimes, supra*, 1 Cal.5th at p. 716.)

21

The Supreme Court's recent opinion in *Jasso, supra*, 17 Cal.5th at pages 669 to 671 is instructive. In that case, in which Jasso was convicted of murdering a taxicab driver in furtherance of a premeditated robbery, the court found the trial court properly admitted as declarations against interest statements made by Jasso's accomplice to a friend. Jasso contended on appeal that the accomplice's statements were inadmissible because they were "overwhelmingly self-serving," pointing a finger at Jasso while characterizing the accomplice as "an innocent bystander who just went along with Jasso's crime, denied planning it, and claimed that he was surprised when Jasso shot [the taxicab driver]." (*Id.* at p. 669.) On the contrary, the Supreme Court found, "much of [the accomplice's] account was inculpatory." (*Ibid.*) The accomplice admitted that although he did not plan the robbery, he went along with it, kept some of the stolen money because he needed it, and helped disassemble and dispose of the murder weapon. (*Ibid.*) These admissions exposed the accomplice "to liability for serious crimes, including both robbery and murder" under theories of felony murder and accessory after the fact. (*Id.* at pp. 669-670.) Further, in the context they were given—to a friend and not to the police in an attempt to shift blame or curry favor with the authorities—they carried the indicia of trustworthiness for admissibility under Evidence Code section 1230. (*Id.* at p. 670.)

Benson also argues the trial court erred in admitting all of the *Perkins* statements offered by the prosecution without conducting a line-by-line evaluation of each statement, relying on our decision in *People v. Gallardo* (2017) 18 Cal.App.5th 51 (*Gallardo*). In that case the trial court "elected to admit the entire 40-page transcript" of defendant Gallardo's conversation

22

with two paid jailhouse informants, in which he revealed his participation in a gang shooting and implicated his codefendants as the primary perpetrators. (*Id.* at p. 72.) The trial court reasoned that "certain details [Gallardo] had provided to the informants regarding the crime (including his identification of Garcia as the shooter, his description of the vehicles used and the route they drove) showed his entire statement was sufficiently trustworthy to warrant its inclusion as a declaration against interest." (*Ibid.*) We disagreed and concluded the trial court abused its discretion in admitting the entirety of Gallardo's conversation with the informants under Evidence Code section 1230 without independently assessing whether the statements implicating his codefendants as the primary perpetrators were also statements against Gallardo's interest. (*Id.* at pp. 70-77.)

*Gallardo* is distinguishable. The record in this case does not support Benson's contention the trial court admitted Wright's statements wholesale without any scrutiny. Wright's conversation with the *Perkins* agent was nearly two hours long, and the prosecution submitted excerpts that, when transcribed, occupy fewer than 10 pages. The prosecution designated these excerpts before trial, and there were multiple evidentiary hearings from which it is clear the court considered the scope of material to be played to the jury. For example, Wright's attorney requested additional portions of Wright's conversation with the *Perkins* agent be played for the jury for completeness. The trial court analyzed and rejected some of the requested portions of the transcript (as not against Wright's interest), but the court granted other requests, including admission of Wright's

exculpatory statement that "y'all know it wasn't me" when the *Perkins* agent asked who "got off."

Moreover, *Gallardo* differs from this case in that Gallardo made essentially all of the self-incriminating statements that he participated in the shooting *before* implicating his codefendants: "He had identified himself as a member of the Largo gang; he had revealed the police found the gun used to commit the crime; he had described the make and model of the weapon; he had admitted he 'knew what happened'; and he had identified the victims as 'Paragons.'" (*Gallardo, supra*, 18 Cal.App.5th at p. 74.) As we explained, "In light of [Gallardo's] prior admissions, identifying Garcia as the shooter and [codefendant] Michael as the driver of the vehicle from which the shots were fired did little to increase [Gallardo's] criminal culpability, and served primarily to 'minimize [his] role and place the blame . . . on [his] accomplice[s].'" (*Ibid*.)

Here, Wright did not substantially incriminate himself first and later shift blame to Benson. Rather, Wright divulged to the *Perkins* agent that Benson (although not named) was one of the shooters as part of Wright's incriminating account of the entire evening, during which Wright and Benson were constantly together. The account included Wright's interaction with the rival Hispanic gang that provoked the shooting, his plan to leave and return in two cars, his flight from the scene, his admission that he fired the gun that was found in his residence, and his knowledge about the disposal of the murder weapon. (See *Jasso, supra*, 17 Cal.5th at pp. 671-672 ["Whether a statement is a collateral assertion not properly admitted as a declaration against penal interest depends not on whose actions it describes, but rather on whether it is an integral part of a statement that

24

inculpates the declarant.  [¶]  . . .  [Perez's] statements about Jasso's actions were part and parcel of an overarching admission to criminal acts."].)

B.     *The Trial Court Did Not Abuse Its Discretion in Denying Benson's Motion for a Mistrial*

After the prosecution presented its case, the court declared a mistrial as to Wright because his trial lawyer became unavailable.  Benson's attorney requested the court also declare a mistrial as to Benson, stating "I think the jury would be prejudiced based upon what they have heard to the extent in regards to evidence and testimony applicable to Mr. Wright as it goes towards Mr. Benson."  The trial court denied the request but agreed to instruct the jury that a mistrial had been declared as to Wright because of an emergency involving his lawyer, and the jurors should not hold the circumstance of Wright's mistrial against Benson.  On appeal, Benson contends the trial court abused its discretion in denying the mistrial motion because the jury heard Wright's inadmissible statements to the *Perkins* agent implicating Benson as the actual shooter and the person who disposed of the murder weapon.

"""A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction.  [Citation.]  Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.  [Citation.]"  [Citation.]  A motion for a mistrial should be granted when """a [defendant's] chances of receiving a fair trial have been irreparably damaged."""""  (*People v. Hin* (2025) 17 Cal.5th 401, 497; accord, *People v. Clark* (2011) 52 Cal.4th 856, 990.)  We

25

review a trial court ruling denying a mistrial for an abuse of discretion.  (*Clark*, at p. 990.)

Benson has not shown incurable prejudice from continuation of the trial after the court declared a mistrial as to Wright.  Wright's statements to the *Perkins* agent were admissible against Benson under Evidence Code section 1230 as statements against Wright's penal interest, regardless of whether they were introduced in a joint or separate trial.  Benson does not present any other grounds to exclude the statements or contend any other trial evidence was admissible only against Wright.

*People v. Turner* (2021) 73 Cal.App.5th 117, relied on by Benson, is inapposite.  *Turner* involved a single defendant who was tried for two unrelated murders after the cases were consolidated.  The trial court granted a motion to sever one of the murder counts on the ground the evidence against the defendant on that murder was weak, but the court denied the defendant's motion to declare a mistrial on the remaining murder count.  (*Id.* at pp. 123-124, 128.)  The Court of Appeal reversed the defendant's conviction, finding the prosecutor failed to show the evidence on the severed murder charge was admissible with respect to the remaining charge, and the jury instruction to disregard the evidence on the severed charge was inadequate to prevent irreparable harm.  (*Id.* at pp. 127-128.)  Here, Benson and Wright were confederates in a single shooting, the *Perkins* evidence was admissible against Benson, and the trial court's instruction to the jury prevented any prejudice from the jury's speculation about Wright's absence from the case.

C.   *The Testimony of the Firearms Examiner Did Not Violate Benson's Confrontation Clause Rights*

1.   *Trial court proceedings*

As discussed, Long Beach firearms examiner Kim testified that she examined the guns, cartridges, and projectiles collected in the investigation and determined, among other things, that the four 9-millimeter cartridge cases recovered from the taco truck had been fired by the semiautomatic pistol recovered in Las Vegas (that was linked to Benson).

When Kim took the stand, the prosecutor asked her several questions to establish her qualifications.  He asked what her job was, how long she had been in the position, and what were the duties of a firearms analyst.  He then asked Kim to state her "background, training, and experience with regard to that work."  Kim responded:  "I received my Bachelors in Chemistry from the University of California, Riverside. . . .  Masters of Science in Forensic Science from Syracuse University.  I have received in-house training as a firearms analyst that closely parallels AFTE, the Association of Firearm and [Toolmark] Examiners training program.  I have completed courses offered through the DOJ, California Criminalist Institute Program in firearms identification.  I have also participated in multiple blind studies of firearms identification as well.  Through accreditation standards with our lab, I am subjected to annual proficiency tests in all the areas that I am signed off.  All my work is verified by a second analyst that is also . . . signed off and approved to do so as well.  And prior to today . . . I have testified in courts."  The prosecutor asked Kim how many times she had qualified as an expert firearms examiner (answer: 10), then asked substantive questions about her forensic analysis in this case.

### 2. *Kim's initial statement that her work is verified by a second analyst was admissible as qualification testimony*

Benson contends admission of Kim's statement that "[a]ll my work is verified by a second analyst" violated his confrontation clause rights under the principles enunciated in *People v. Sanchez* (2016) 63 Cal.4th 665, 668 (*Sanchez*) because it introduced hearsay by a nontestifying expert that the second expert agreed with Kim's analysis and thus "gave the impression that Kim's work was entitled to more weight than it would otherwise deserve." There was no *Sanchez* violation.

The Supreme Court in *Sanchez* held, "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth. If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing."[13] (*Sanchez, supra*, 63 Cal.4th at p. 686, fn. omitted; see *Crawford v. Washington* (2004) 541 U.S. 36, 59; *People v. Garton* (2018) 4 Cal.5th 485, 505 [county coroner's testimony conveying the details and findings of an autopsy performed by her retired predecessor was hearsay and violated defendant's confrontation clause rights under *Sanchez*]; *People v. Nadey* (2024) 16 Cal.5th

---

[13] Because we conclude Kim's testimony was properly admissible, we do not reach the People's contention Benson forfeited his *Sanchez* objection by failing to object at trial.

28

102, 163 ["'[a] hearsay problem arises when an expert simply recites portions of a report prepared by someone else'"].)  "Case-specific facts," the Supreme Court explained, "are those relating to the particular events and participants alleged to have been involved in the case being tried."  (*Sanchez*, at p. 676.)

Sanchez reaffirmed the longstanding evidentiary principle in California courts that an expert witness "may still *rely* on hearsay in forming an opinion and may tell the jury *in general terms* that he [or she] did so."  (*Sanchez, supra*, 63 Cal.4th at p. 685; accord, *People v. Curiel* (2023) 15 Cal.5th 433, 457.)  An expert may tell the jury "generally the kind and source of the 'matter' upon which his [or her] opinion rests," because the "jury may repose greater confidence in an expert who relies upon well-established scientific principles . . . [and] accord less weight to the views of an expert who relies on . . . a lone experiment whose results cannot be replicated.  There is a distinction to be made between allowing an expert to describe the type or source of the matter relied upon as opposed to presenting, as fact, case-specific hearsay that does not otherwise fall under a statutory exception." (*Sanchez*, at p. 686; accord, *People v. Camacho* (2022) 14 Cal.5th 77, 128 [in *Sanchez* the court recognized "an expert may 'tell[] the jury the expert relied on additional kinds of information that the expert only generally describes'"].)

Kim did not present any "case-specific out-of-court statements."  (*Sanchez, supra*, 63 Cal.4th at p. 686.)  Her statement that her work is verified by a second analyst and is "signed off and approved" was given in response to the prosecutor's request for her background, training, and experience, and her response addressed in general terms the quality assurance measures that made Kim's approach scientific

and reliable.  Kim went on to testify in detail regarding the analysis she conducted with respect to the evidence from the shooting, and in so doing she never described another expert's findings, nor did she state that another expert validated her findings as they "relat[ed] to the particular events and participants alleged to have been involved in the case being tried."  (*Sanchez*, at p. 676.)  There is no reasonable reading of Kim's qualification statement to mean that a second, unnamed expert conducted an independent analysis of the firearms evidence from the taco truck shooting, and that she was relaying that expert's opinion.

*People v. Azcona* (2020) 58 Cal.App.5th 504, 515, relied upon by Benson, is distinguishable.  There, as here, the expert firearms analyst testified in response to a question about his "'procedure'" that "'[a]ll of my work is reviewed by another firearms examiner at the laboratory with many . . . years of experience.'"  (*Id.* at p. 514.)  But the expert went on to testify with respect to his firearm toolmark analysis, "'It was reviewed for technical aspects in the report to be sure I had everything correct in my work and I didn't transpose anything.'"  (*Id.* at p. 514.)  The prosecution then introduced his report, "which had been initialed to indicate it was reviewed by two other examiners," and "the expert again testified that everything in the report had been checked and approved by his supervisors."  (*Ibid.*)  The Court of Appeal found there was a *Sanchez* error: "[W]hen the expert told the jury that another examiner had indicated approval of and agreement with the expert's conclusions *in this case* . . . [t]he prosecution was in effect able to introduce the opinion of a second expert without exposing that witness to cross-examination."  (*Ibid.*, italics added.)  Here, as

discussed, Kim did not testify that another expert analyzed each aspect of her work and agreed with each of her conclusions "in this case."

D.  *Benson Did Not Meet His Burden To Show His Inability To Pay the Court Fines and Assessments*

Benson contends the trial court's imposition of statutory fines and assessments without a determination he was able to pay them violated his due process and equal protection rights under this court's opinion in *People v. Dueñas*, 30 Cal.App.5th 1157.  In *Dueñas*, we concluded "the assessment provisions of Government Code section 70373 and Penal Code section 1465.8, if imposed without a determination that the defendant is able to pay, are . . . fundamentally unfair; imposing these assessments upon indigent defendants without a determination that they have the present ability to pay violates due process . . . ." (*Dueñas*, at p. 1168; accord, *People v. Belloso* (2019) 42 Cal.App.5th 647, 654-655, review granted Mar. 11, 2020, S259755.)

However, as we subsequently explained in *People v. Castellano* (2019) 33 Cal.App.5th 485, 490, "Consistent with *Dueñas*, a defendant must in the first instance contest in the trial court his or her ability to pay the fines, fees and assessments to be imposed and at a hearing present evidence of his or her inability to pay the amounts contemplated by the trial court."  In *Castellano*, we held that a defendant did not forfeit an opportunity to request a hearing at which to present evidence of his inability to pay court fines and assessments because he was sentenced before *Dueñas* was decided and his challenge was "based on a newly announced constitutional principle that could not reasonably have been anticipated at the time of trial." (*Castellano*, at p. 489.)  Accordingly, we remanded to give the

31

defendant an opportunity to "demonstrat[e] his inability to pay the fines, fees and assessments imposed by the trial court."  (*Id.* at p. 491.)

Here, Benson was sentenced several years after *Dueñas* was decided, and he forfeited the opportunity to request a hearing on his ability to pay the fines and assessments by failing to request the hearing at the time of sentencing.  Further, as the People observe, Benson's only reference to his ability to pay at the hearing was his trial attorney's statement in connection with the court's imposition of the minimum restitution fine of $300 as follows:  "Your honor, I would just like it to be noted that my client is of limited means."  The attorney's statement was not substantial evidence of Benson's inability to pay the fees and assessments, nor did it constitute a request for a hearing.

## DISPOSITION

The judgment is affirmed.

FEUER, J.

We concur:

MARTINEZ, P. J.

STONE, J.